Next case is 21-1443, Western Missouri, GP3 II, Etoll v. Litong Capital. Good morning. Good morning, counsel. Before we start, I have to give an alert here. After this case was assigned to the panel, in December, my wife, through her local broker, bought a few shares of JPMorgan Chase. When I picked up the briefs in early January and saw that JPMorgan Chase was the issuer of the International Standby Letter of Credit, it raised a red flag because I did quite a bit of litigation and private practice involving International Standby Letters of Credit. So I went to the District Court CME-CF entries. I saw no appearance on behalf of JPMorgan Chase. I saw no filings on their behalf. I saw no reference in the brief to anything other than the fact of their role. And so it seemed to me that for this interlocutory appeal, at least, involving the denial of a preliminary injunction regarding a draw on a letter of credit that has not yet been made, it seemed to me that I did not need to recuse, even if the case came back on the merits of JPMorgan Chase having a more central role. Now, I would invite counsel to respond today or by writing in the next week if you have a different view, if you think I should recuse and state the reasons. And I would certainly take that under advisement and consider it. It doesn't affect the submission of the case today, even if you objected and I thought you were right. I could try to talk my wife into selling the shares, risking taking one more step toward divorce. Or I could recuse, in which case the other two members of the panel, there's still a quorum and they could either decide the case or ask for appointment of a third judge. So I wanted to alert you to that. If you have any comments this morning, fine. As I say, if you want to write a letter, please do it in the next week commenting on this. Judge Lincoln, thank you very much on behalf of Appellant Leetong Capital. It's not an issue to us at all. JPMorgan Chase is historical at this point. We do not see any issue, but thank you for alerting us, Your Honor. Your Honor, likewise, on behalf of GP32, we see no issue, Your Honor. The letter of credit, essentially, it's been extinguished. So even if it wasn't, we don't think there was an issue. But certainly now it's been extinguished and even more so that there wouldn't be a reason for a conflict. Your Honor, the same is true for Bank of the West. Very good. Thank you, Counsel. Mr. Figueredo, I think you are up. Yes. Thank you, Your Honor. May it please the court, Mark Figueredo for Appellant Leetong Capital. I'd like to focus on the standby letter of credit and not the issuer, JPMorgan Chase, but the date of this SPLC, which was June 28th, 2019. And I'd also like to point out that the purchase order issued by Leetong Capital to its supplier to fulfill the order was dated June 29th, 2019, the very next day. That is not a coincidence. At issue in this case is predominantly one of apparent authority, apparent authority. There's universal agreement under the law as to acts of the principal principle at the time of the transaction, whether it's the Dirks case or Gower cited in the opinion or Alexander. I mean, there's universal agreement under the law that we're talking about acts of the principal at the time of the transaction where the district court erred, in our view, is in equating the transaction with the date of the contract. Leetong had virtually had really no obligation to do anything under this contract until the principal GP three performed as of June 27th, 2019, notwithstanding the contract is signed in February of 2019. Leetong could have walked away scot-free according to the letter and in reality under the contract. And yes, there's a $5 million deposit in the SPLC was timed after, but there was performance by GP three that was required before Leetong's obligations arose. GP three chose to perform by doing the standby letter of credit, the $20 million SPLC as opposed to the 5 million, even better for Leetong as June 28th, the very next day, even though there were months of legwork and preparations on this. The very next day is when Leetong went hard and committed with its supplier, issued a purchase order, obligating itself to a $17 million liability. The testimony of Leetong's principal, Alice Song, I want to make sure the court is aware of this. In the appellate's appendix to page 214, there's deposition testimony of Ms. Song, where she testifies to her concerns about the fact that this Ron Green character doesn't seem connected with GP three. Despite Ron Green's references to himself as a partner of GP three, he signed the contract as a partner. There's letterhead as a partner. He's not invoices as partner communications as partner. There was concern. There was discussion about, well, why don't you wait until they perform? Only GP three can issue a standby letter of credit. It's a $20 million obligation. It is not insignificant. Leetong thought that made sense. That's what it did. It waited until the next day until GP three issued the standby letter of credit. It issued the letter of credit. At that point, Leetong was obligated. At that point, had Leetong not performed, it could be in breach of contract. As of June 27th, Leetong could have walked away and could not be accused because the condition precedent to its performance had not arisen. Now, there are a lot of different types of contracts, unilateral, bilateral, executive, executory. Under the law, the law does not state that the conduct of the principle has to be looked at at the time of execution of a contract, which is how I believe the district court interpreted the law. The law states that the conduct of the principle has to be looked at at the time of the transaction. We are within that time frame here, and I think that is a critical period right there. Now, the action of the principle was not just issuing this standby letter of credit. It was performing the contract. The SPLC specifically names Leetong. It is a term required by the contract in the exact amount. It was performance of the contract by the principle. At that point, Leetong believes this is a valid contract. Whatever doubts it had before then were extinguished when GP3 performed its obligation, the first obligation under the contract. Leetong… Isn't this really a ratification argument? And I think there was a question about whether that had been raised in the district court. Yes. I think what – the other aspect of this is how do you exercise authority, right? And ratification is one of the ways that authority can be recognized. You hear the phrase commonly, authorized, approved, and ratified, authorized, approved, and ratified. Well, that's just past, present, and future tense. Authorize something today to do tomorrow. Approve something in real time. That's the present. Ratify is action that happened in the past that by future conduct is recognized. Authority can be bestowed at different times. Now, what GP3 did, whether you use the term – and I know ratification can be a legal concept and a loaded term. Whether you use the word ratify or recognize, the concept is GP3 performed on the contract. Therefore, it recognized the contract or it ratified the contract. That determination is not that important to us. What is important is that there was authority granted here and there was performance by principle. And – But it's authority to enter the contract in the first place, right? That is where I disagree. I respect – And I know you want to push the date to much later because it appears you don't have much to rely on, at least actions by the principle here. So you want to push the date later, but that seems to me to be more of a ratification argument rather than did he have authority to enter the contract. I think that's right. Now, if you look at it from a time period of – was there acts of the principle before the contract was entered into? If that is the law, if the law is – if the date of the contract is controlling, we lose. But that is not the law. The law is the time of the transaction, and what is the transaction? And I submit that the transaction is larger than simply the date a contract was entered into. I believe you have to look at the totality of the transaction, who has to perform and when. And there is – there is the aspect under the law also of – for apparent authority. You have to have obviously the manifestation. You have to have the reasonable belief. But you also have to have resulting harm to the party relying on the authority for believing on it. And the resulting harm here – there is a resulting harm because June 27th, there's no resulting harm. Li Tang could have walked away irrespective of the contract being dated in February. June 28th, the SPLC is issued. Once that SPLC is issued, Li Tang is subject to liability. If they don't perform, they're in breach of the contract. They could be held in breach of the contract. Therefore, the transaction became real on June 28th even though it was signed earlier. GP3 – and then the transaction, obviously it's not a single date. You have to look at the total transaction we submit. Following that, a few days later, a week or two, Li Tang sends an invoice to the principal, and this has been briefed. He sees the invoice. Whatever is going through his head, whether he considers it a bonus or not, he is on notice that Li Tang is seeking payment for provision of pipes. GP3, the principal, then amends the SPLC specifically to provide for the payment of Li Tang's invoice. The SPLC was amended specifically to cover the invoice. Li Tang then relies on that to enter into the receivables purchase agreement with Bank of the West. That's the resulting harm here. Now, this is an arbitration, a de novo review. Our objective here is just to get this case determined on the merits and not to have the contract torn up under these circumstances. We're asking this court simply to let the matter be adjudicated on the merits in an arbitration subject to the review and continuing jurisdiction of the district court to confirm, correct, or vacate an award if the arbitrator exceeds the authority. Unless there are any questions from the panel, I would like to reserve my time for rebuttal. Well, the way you describe the relief requested brings in the arbitral forum in China and the argument, first of all, that it should not be enforceable. But also, how does the district court have authority to review that? Are you conceding that? Let me address that head on. Never have I ever said – my client has ever said that we want to arbitrate this in China. I don't speak Chinese. I'm not a Chinese attorney. I have arbitrated disputes, for example, through the American Arbitration Association's ICDR, International Center of Dispute Resolution, for cross-border commercial transactions. There are sophisticated arbitrable bodies and provisions to deal with cross-border disputes. Our job is – our mission is to get this into arbitration, and there are issues. Bank of the West raises these with respect to the forum. And under Section 5 of the Federal Arbitration Act, there are mechanisms to get an appropriate jurisdiction when there is – when there are issues about the choice of forum, which admittedly there is some here. So to be clear, I've never been asked by counsel or anyone where to arbitrate. I'm happy to have that discussion, and it is not China, just to be clear. Unless any other questions, I'd like to reserve for rebuttal. Thank you. Mr. Abrams? Good morning, Your Honor. May it please the court. Michael Abrams on behalf of GP32. Let me first take up this last question about arbitration. I believe that Mr. Nichols will address this further on behalf of the bank. But the arbitration clause in this alleged contract says arbitration shall take place in Beijing, China and shall be submitted for arbitration to the Arbitration Committee of the Court of Beijing, China. Let me next get to standard of review because it's important here, and we think that the appellant has it wrong. Li Tong incorrectly identifies the standard of review as de novo. The de novo standard does not apply because the case presents no issue of contract interpretation. This dispute about arbitrability contains fact-intensive issues for contract formation, apparent authority. The district court decided this issue based upon the evidence presented by the parties after a period of discovery that was dedicated to this issue. And so when an arbitration agreement calls for the district court to decide whether a signatory had actual or apparent authority to execute an agreement, the decision is reviewed under the clearly erroneous standard. And we cite to the Oak Grove case from this court, the Oak Grove Hayage case from this court back in 2013. Counsel, what if the issue is identification of the transaction at question of law? It's probably a mixed question, Your Honor, but let me let me get to that point. Counsel used the phrase that GP3 performed under the contract. GP3 did not, to be clear, and there is no evidence to the contrary, GP3 did not know of the existence of this contract until litigation transpired. It did not sign an invoice. It didn't know of an invoice. An invoice was presented to it. And the principal of GP3, Mike Heitman, the CEO, who Lee Tong knew was the CEO of GP3, said, why would I sign a fraudulent invoice? And it was never signed on behalf of GP3. And maybe it's important here to clarify who the parties are, because there's a lot of different parties here. And stop me if you want to go to something else. But this case obviously involves a proposed water pipeline project in the drought stricken area of south central New Mexico. My client, GP3, which is a subsidiary of GARNI, are experts in the construction of major water transportation systems all over this country. New Mexico Regional Water, whose head is Ron Green, is the developer. New Mexico Regional Water is unrelated to GP3. GP3 was interested in being a contractor for the water project and agreed to post the standby letter of credit in order to assist the project developer, New Mexico Regional Water, in its efforts to raise money. And unbeknownst to GP3, this fraudulent invoice for the manufacture of pipe in mainland China was forged in the name of GP3 and presented to Bank of the West. And so in order to prevent the drawdown on the standby letter of credit, GP3 filed suit seeking an injunction and received an injunction, which is not very typical. It's under Article 5-109 of the UCC, that the underlying invoice was fraudulent. And the district court granted the injunction in joining Litong from drawing down on that standby letter of credit and Bank of the West from drawing down on the standby letter of credit. The court found that GP3 was likely to succeed on the claim of a material fraud after Litong repeatedly provided the district court with falsified evidence. The district court held that the evidence presented by GP3 suggested that no pipe was ready for shipment, that no pipe conforming to the specification of the contract exists, and that Litong's claim under the invoice appeared to be materially fraudulent. So the court prevented, and I don't use these words lightly, they prevented a swindle here of $20 million. And after the court issued that injunction, Litong moved to compel arbitration in mainland China before this arbitration committee. Now, it is this issue of apparent authority. They now recognize that there is no actual authority from Ron Green. Ron Green was never an employee of GP3. He was never an officer of GP3. He held no position at GP3. And GP3 never— Counsel, but as I understand it, GP3 was not only a financer, but it was recruited. Green understood it was recruiting other financing facilities. So Green had a strong interest in the success of those undertakings. And it is not surprising, maybe in hindsight, that he wasn't too careful about what papers he signed saying what to whom. Right. Your Honor, if your point is that there was a financial interest on behalf of the developer, New Mexico Regional Water, and Ron Green, in order to secure financing on this project, absolutely correct. But GP3— And GP3 was—that was part of its role, as I understand from the briefs. GP3 was—wanted to be the contractor on this project and agreed to, in order to get some financing, to help with the financing effort, agreed to pose a standby letter of credit that showed their financial interest in the project. But, Your Honor— But more than that, it agreed to attract other investors to NMR, to New Mexico. Right. Exactly. And— Green would know that, obviously, just as Eichmann knew it. Green would know that. What was—what is absolutely clear, and there's not a shred of evidence to show this, is that GP3 had no idea that Ron Green was signing agreements. By the way, he claims he did not sign—his testimony was that he did not sign this contract. But there is not a shred of evidence that GP3 had any idea that Ron Green had signed this invoice. Lee Tong never submits the invoice for payment. They never— You know, counsel, you're looking—you're looking at one transaction, and there's no evidence and so forth. I would say that the circumstances, as I've described them and you haven't criticized, create, big-picture-wise, the inference of some authority of Green to act in a way that would help GP3 attract other investors to New Mexico. Your Honor, what I would say to that is that under Missouri law, Lee Tong has the burden of demonstrating one of three methods of creating apparent authority by GP3, none of which are present here. Number one, expressly telling a third party— Okay, I understand. That's in the brief and was the basis of the district court's decision. I was just saying your blanket statement that there isn't a shred of evidence that GP3 and Eidman had any idea of what Green might be doing, I don't buy. Well, your Honor, just to be clear, they knew and they expected the developer to try to raise financing for the project. What they did not expect and that there's no evidence of is that he would bind—that Ron Green would try to bind GP3 to a false invoice, an invoice that makes no sense whatsoever. But, counsel, it seems to me in the apparent authority world, there are plenty of principals who have been found to have granted apparent authority that had no expectation that the nasty thing the agent then did would happen. But, Judge, what's different here is there needs to be one of those three things, the three things under Missouri law to grant apparent authority. You either have to tell a third party it did not happen. You either have to allow the person on prior occasions to act as the agent on its behalf. Never happened before. There's a first transaction between the parties. Or three, you need to provide the person with a position that generally carries authority on behalf of the principal. That never occurred here. And so I want to be respectful. We have a very limited time and I need to be respectful to my cross-appellate because I promised him I would give him five minutes. So, Your Honor, I'm happy to address other questions, but I want to be respectful to Mr. Nichols' time. Very good. Mr. Nichols. Thank you, Your Honor. Briefly addressing the issue of the forum, the arbitration provision in this case specifically says it's a strange provision. It says that all disputes coinciding with the execution of the contract shall be settled in a friendly manner through negotiations. In case no settlement can be reached, the case may then be submitted for arbitration to the Arbitration Committee of the Court of Beijing, China. The arbitration shall take place in Beijing, China. The Arbitration Committee of the Court of Beijing, China is the only arbitration forum that is mentioned in that provision. And under the A1 premium acceptance case from the Supreme Court of Missouri, it's clear that if there is a forum that is selected that is not an available forum for arbitration, that makes it so that you no longer have any ability to compel someone into arbitration. The burden of proving the arbitration provision is on the party that's seeking to enforce it, and that party here is Litang. And Litang has failed to demonstrate that this is an enforceable provision because they've failed to demonstrate that that forum even exists, and I think may have even just acknowledged that it might not exist. I assume that the Missouri Supreme Court decision wouldn't trump Federal Arbitration Act authorities. It doesn't, but thankfully for us, there's a federal case as well that we cited in our brief, and I apologize that I'm not sure how to pronounce this word. But in an ATM versus cash call, it's an 11th Circuit decision, but it aggregates a variety of federal cases that hold to the same fact that if the arbitration provision calls for a specific forum. But wouldn't that require a separate proceeding? I mean, because counsel said this morning there's all kinds of arbitrable bodies worldwide for cross-border disputes, and that they'd be willing to do it. And so it seems to me that the Federal Arbitration Act would probably require some kind of a hearing before making a final decision that the arbitration clause is unenforceable for this reason. It very well may, Your Honor. Of course, they've had the opportunity to present that evidence. It was an issue that we raised at the district court level. Wait a minute. It wasn't a basis for the district court decision either. That's fair. That's fair, Your Honor. Okay. And that brings me to a point about for Bank of the West. In our view, the decision on this case is simple as it relates to Bank of the West. If the district court's determination on arbitration is affirmed by the court as to GP3, I think everybody involved agrees it has to be affirmed as to Bank of the West as well. But if the district court's decision as to arbitration with regard to GP3 is reversed, this court should remand the case to the district court for further findings of fact and conclusions of law as it relates to Bank of the West. And as to whether or not the arbitration provision in this contract that Bank of the West is, of course, not a party to is still binding on Bank of the West. As it stands now, the only decision that the district court made regarding arbitration of Bank of the West is that because Lee Cohen could not enforce the arbitration provision against GP3, it similarly couldn't enforce it against Bank of the West. Let me ask you this, because it isn't apparent to me, I don't think. If we affirm this appealable intermediate order, how do you envision the case proceeding? I would assume that the case just proceeded in the district court and would just move forward. It's not an arbitrable case, based on the court's decision that the arbitration provision is not enforceable. How much of the case has the injunction decided? As it relates to my client and the claims that my client has, it hasn't decided those claims at all. Our claims are for fraud and breach of contract related to the underlying invoice. As it relates to a separate contract that we entered into with Tom, those issues would remain and would be available to be tried at the district court level. Thank you. That's what I thought, but it hasn't been clarified. Of course. I guess I would just wrap up by saying that, reiterating my point, there's only really two options with regard to Bank of the West that make sense. Either the court affirms a lower court decision and affirms Bank of the West is not required to arbitrate, or the court reverses that to GP3 and remands to the district court to make actual findings, and to the fact and conclusions of law related to the claim of arbitration against Bank of the West. Thank you. Very good. Let's see. How much time is there for rebuttal? Three and a half minutes. Yes. Thank you, Your Honors. I'd like to just briefly respond to just a few points. Number one, a red herring regarding a place of arbitration, as mentioned earlier. Whatever we need to do to get it into the appropriate form, not in China, is our position. We have never taken a position of the contrary. With respect to GP3's allegation that we've changed position from actual to apparent authority, that is not the case. This has always been an apparent authority case. We've never alleged actual authority. And with respect to GP3's contention that Mike Heitman, the principal at GP3, didn't know about the contract, he certainly should have known. He had an invoice. He performed – he was asked to issue a standby letter of credit in the amount of $20 million for Litong. This is a sophisticated person who runs a company, Garni Construction. They created this special purpose entity, GP3, for this New Mexico water project. To plead ignorance is just beyond the pale. When asked specifically, well, what did you think this was for, issuing a $20 million SBLC to Litong? He says, well, I thought it was in connection with some financing arrangement. Well, how did that work, is the follow-up question. He didn't know. He issued a $20 million SBLC without knowing. One thing this reminds me of, my 16-year-old daughter just recently started playing chess, competitive chess, and she's struggling with the time clock. And this case reminds me of that because in chess, white goes first, hits the button for the time, then black goes. In this particular transaction, Litong was playing black. They agreed to play chess. They weren't sure who was going to show up against them, but whoever it was was playing white. GP3 comes in. They make the first move on June 28th, the opening move with the $20 million SBLC. Litong makes the second move. Litong, $17 million purchase order to its supplier, issues an invoice. GP3 makes the third move. They amend the SBLC after receiving the invoice to specifically cover payment of Litong's invoice. Litong makes the fourth move. It enters into a receivable purchase agreement with Bank of the West, which is now the basis of liability to Bank of the West, which would proceed if the district court's decision is affirmed. GP3 would walk away scot-free. We're left holding the bag with Bank of the West and with the supplier. At four moves into the game, GP3 says, we're walking away from the table, and there's nothing you can do because you didn't know that it was actually us you were playing when you agreed to play. That's the situation we're in here. We don't think that's right. We're respectfully asking the court to reverse. And then with respect to Bank of the West, whether they're arbitrated or stayed, the provisions of the Federal Arbitration Act are great. They encompass this. They allow for either arbitrating it, staying it, having jurisdiction over it. There's many mechanisms to control that. So with that, I will conclude. Thank you, Counsel. It's obviously a very complicated situation that produces a complicated case, even though it's interlocutory. But it's been thoroughly briefed, and the argument's been very helpful. We will take it under invite.